**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| REYMUNDO Z. MENDOZA, *et al.*, |
| Plaintiffs, |
| v. |
| HILDA SOLIS, *United States Secretary of Labor*, *et al.*, |
| Defendants, |
| v. |
| WESTERN RANGE ASSOCIATION, *et al.*, |
| Intervenor-Defendants. |

Civil Action No. 11-1790 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

The plaintiffs, who are four former open-range agricultural workers, bring this action against the defendants United States Secretary of Labor and United States Department of Labor pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, seeking vacatur of two guidance letters that were promulgated without notice-and-comment rulemaking. The plaintiffs claim that the two guidance letters qualify as "rules" and therefore were subject to the notice-and-comment requirements of the APA. Two agricultural associations, Western Range Association and Mountain Plains Agricultural Services, have intervened as defendants and have moved to dismiss this action for lack of subject-matter jurisdiction. Additionally, the plaintiffs, the defendants, and the intervenor-defendants have each moved for summary judgment on the merits of the plaintiffs' administrative procedure claim.

1

## I.     BACKGROUND

### A.     Statutory and Regulatory Framework

Under the Immigration and Nationality Act ("INA"), as amended by the Immigration

Reform and Control Act of 1986 ("IRCA"), foreign workers may be hired to perform temporary

agricultural work in the United States through the H-2A visa program.  *See* 8 U.S.C.

§ 1101(a)(15)(H)(ii)(a).  The H-2A program grants temporary work visas to any nonimmigrant

alien who "ha[s] a residence in a foreign country which he has no intention of abandoning who is

coming temporarily to the United States to perform agricultural labor or services."  *Id.*  Any

employer petitioning to import an H-2A worker must first obtain certification to do so from the

Secretary of Labor.  *See* 8 U.S.C. § 1188(a).  The criteria for certification are, *inter alia*, that

(1) "there are not sufficient workers who are able, willing, and qualified, and who will be

available at the time and place needed, to perform the labor or services involved in the petition,"

and (2) "the employment of the alien in such labor or services will not adversely affect the wages

and working conditions of workers in the United States similarly employed."  *Id.* § 1188(a)(1).

To qualify for certification, a prospective H-2A employer must agree to a number of obligations,

including, *inter alia*:  (1) keeping any job opportunity open to any qualified U.S. worker on a

non-discriminatory basis; (2) providing employment to any qualified U.S. worker who applies

until fifty percent of the period of the job opportunity's work contract has elapsed; (3) actively

recruiting qualified U.S. workers within a multistate region for any job opportunity; and

(4) complying with all applicable federal, state, and local laws and regulations, including health

and safety laws and the Fair Labor Standards Act ("FLSA"), where applicable.  *See* 20 C.F.R.

§ 655.135.[1]

---

[1] The FLSA specifically provides an exemption from its minimum wage and maximum hour requirements for, *inter alia,* "any employee employed in agriculture . . . if such employee is principally engaged in the range production of

In order to ensure that the importation of H-2A workers does not "adversely affect the wages . . . of workers in the United States similarly employed," 8 U.S.C. § 1188(a)(1), Department of Labor regulations require H-2A employers to pay their hourly workers what is known as an "adverse effect wage rate" or "AEWR."  *See* 20 C.F.R. § 655.122(l); *see also id.* § 655.120(a) (generally requiring H-2A employers to "pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage").  The AEWR is "[t]he annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the U.S. Department of Agriculture (USDA) based on its quarterly wage survey."  *Id.* § 655.103(b).  The AEWR is designed to "insure against a lowering of wages" that might otherwise result from the importation of foreign labor.  *See, e.g.*, *Williams v. Usery*, 531 F.2d 305, 307 (5th Cir. 1976); *see also Rowland v. Marshall*, 650 F.2d 28, 29 (4th Cir. 1981) (per curiam) ("The purpose of the AEWR is to prevent the importation of nonimmigrant aliens from deflating the wages and from adversely affecting the working conditions of the United States workers similarly employed." (citing 20 C.F.R. § 655.0(e))).  Additionally, H-2A employers are required to pay workers "at least twice monthly or according to the prevailing practice in the area of intended employment, whichever is more frequent."  20 C.F.R. § 655.122(m).

With respect to working conditions, Department of Labor regulations require that H-2A employers provide a minimum level of benefits and working conditions, including housing, workers' compensation insurance, meals, supplies, and transportation.  *See* 20 C.F.R.

---

livestock."  29 U.S.C. § 213(a)(6)(E).  This would include any employee who "spends more than 50 percent of his time during the year on the range," engaged in the "production of livestock," which would include sheepherding, goatherding, and other occupations involving the open-range production of livestock.  *See* 29 C.F.R. §§ 780.325–29.  The primary purpose of this exemption appears to be that when an employee works in such an occupation, his work duties "necessitate[] his constant attendance on the range, on a standby basis, for such periods of time so as to make the computation of hours worked extremely difficult."  *Id.* § 780.329.

§ 655.122(c).  The minimum working conditions include the employer's obligation to provide

housing at no cost to their H-2A workers, and the employer-provided housing must generally

meet the standards set forth by the Occupational Safety and Health Administration ("OSHA").

*See id.* § 655.122(d)(1).  All H-2A employers are also generally required to request an inspection

of the housing they provide, and the inspection must be completed prior to issuance of any H-2A

certification.  *See* Temporary Agricultural Employment of H-2A Aliens in the United States

("2010 H-2A Rule"), 75 Fed. Reg. 6884, 6908 (Feb. 12, 2010).

     The Department of Labor has, for many years, permitted exceptions to these generally

applicable procedures "to recognize unique circumstances and characteristics for some

agricultural employer/worker situations," such as sheepherding and occupations involving the

open-range production of livestock.  *See* 52 Fed. Reg. 20,496, 20,497 (June 1, 1987) (codified as

amended at 20 C.F.R. pts. 654–55).  These "special procedures," as they were first promulgated

through the 1987 rulemaking, permitted the Director of the U.S. Employment Service (the

"Director) to "establish monthly, weekly, or bi-weekly [AEWRs] for" occupations

"characterized by other than a reasonably regular workday or workweek," such as the range

production of sheep or other livestock, though the Director was still required to establish these

special AEWRs "consistent with the methodology" used for the standard AEWR, *i.e.*, "the

annual weighted average hourly wage rate for field and livestock workers (combined) for the

region . . . based on the USDA quarterly wage survey."  *See id.* at 20,508–09, 20,521.  The 1987

rule also generally authorized the Director "to establish special procedures for processing H-2A

applications when employers can demonstrate upon written application to and consultation with

the Director that special procedures are necessary."  *Id.* at 20,508.  Finally, the 1987 rule

required that housing for "workers principally engaged in the range production of livestock"

must meet OSHA housing standards or, "[i]n the absence of such standards," open-range housing was required to "meet guidelines issued by [the Employment Training Administration, or 'ETA']." *Id.* at 20,513.

Pursuant to the authority delegated in the 1987 rulemaking, the Department of Labor published Field Memorandum 74-89 in May 1989, which set forth a number of "special procedures governing the labor certification process for temporary alien sheepherders."[2]  Fed. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Mem.") Ex. A at 1, ECF No. 28-2. The special procedures contained in Field Memorandum 74-89, *inter alia*, (1) permitted employers to describe the anticipated hours of open-range herding positions as "on call for up to 24 hours per day, 7 days per week," and exempted employers from recording and reporting hours offered and worked, *id.* at 7; (2) permitted employers to offer open-range herders, at minimum, "the prevailing wage rate for the occupation in the State as determined by the [State Employment Service Agency, or 'SESA'] prevailing wage survey . . . or a special monthly [AEWR] established by the National Office," *id.* at 9; and (3) established standards for mobile housing used by H-2A open-range herders, *id.* at 20–24.  The mobile housing standards issued in the 1989 special procedures, unlike the generally applicable procedures, did not specifically require that open-range mobile housing have a running cold-water tap, electricity, or modern toilet facilities.  *Compare* 20 C.F.R. §§ 654.404–17 (housing standards generally applicable to H-2A housing), *with* Defs' Mem. Ex. A at 20–24 (special mobile housing standards).  The special procedures were updated in 2001 and 2007, but have remained substantially and continuously in place.  *See* Defs.' Summ. J. Mem. Ex. B, ECF No. 28-3 (Field Memorandum 24-01, published

---

[2] Despite the language referring only to "sheepherders," the special procedures contained in Field Memorandum 74-89 "apply as well to goatherders attending goats grazing on the range, and except as otherwise provided, references to sheep apply to goats as well."  Defs.' Summ. J. Mem. Ex. A at 6 n.1.

August 2001); *id.* Ex. C, ECF No. 28-4 (Training and Employment Guidance Letter No. 15-06, published February 2007).

The Department of Labor's H-2A regulations were most recently amended pursuant to a final rule that was promulgated through notice-and-comment procedures on February 12, 2010. *See* 2010 H-2A Rule, 75 Fed. Reg. 6884.  The 2010 H-2A regulations reaffirmed the authority of the Department of Labor (in particular, the Office of Foreign Labor Certification ("OFLC")) to "establish, continue, revise, or revoke special procedures" for processing H-2A applications for sheepherders and "occupations in the range production of other livestock."  *See id.* at 6959–60. On August 4, 2011, pursuant to the authority provided in the 2010 rulemaking, the DOL published in the *Federal Register* two Training and Employment Guidance Letters ("TEGLs")— one that applies to H-2A applications for "sheepherding and/or goatherding activities," and one that applies more generally to "the open range production of livestock in the United States."  *See* Training & Employment Guidance (TEGL) Letter No. 15-06, Change 1, Special Procedures: Labor Certification Process for Occupations Involved in the Open Range Production of Livestock under the H-2A Program (the "Open Range TEGL"), 76 Fed. Reg. 47,243 (Aug. 4, 2011); Training & Employment Guidance (TEGL) Letter No. 32-10:  Special Procedures:  Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program (the "Herding TEGL"), 76 Fed. Reg. 47,256 (Aug. 4, 2011).  The *Federal Register* notices described the TEGLs as "guidance," *see* Open Range TEGL, 76 Fed. Reg. at 47,244; Herding TEGL, 76 Fed. Reg. at 47,257, and the plaintiffs and the government

defendants agree that the TEGLs were promulgated without notice-and-comment procedures, *see* Compl. ¶ 18, ECF No. 1; Answer ¶ 18, ECF No. 10.[3]

The special procedures contained in the 2011 Open Range TEGL do not differ in any material respect from their prior 2007 iteration. They substantially continue the special procedures regarding hours, wages, and mobile housing standards discussed above. *Compare* Open Range TEGL, 76 Fed. Reg. at 47,244–47, *with* Defs.' Summ. J. Mem. Ex. C at 3–6. The special procedures contained in the 2011 Herding TEGL, however, differ somewhat from their prior 2001 iteration regarding wages that employers are required to pay H-2A herders. Specifically, the 2001 iteration (Field Memorandum 24-01) specified that employers seeking H-2A certification for herders were required to offer workers the highest of: (1) "the prevailing wage rate for the occupation in the State as determined by the SESA prevailing wage survey and verified by the National Office," (2) "a special monthly [AEWR] established by the National Office," or (3) "the legal federal or state minimum wage rate." *See* Defs.' Summ. J. Mem. Ex. B at 7. The 2011 Herding TEGL, however, provides that H-2A employers are only required to offer herders "the monthly, weekly, or semi-monthly prevailing wage established by the OFLC Administrator for each State listed in an approved itinerary." Herding TEGL, 76 Fed. Reg. at 47,258.[4] This prevailing wage rate is calculated from the "findings from prevailing wage surveys conducted by [State Workforce Agencies, or 'SWAs'] . . . consistent with the wage setting procedures historically applied to sheepherder occupations in the Western States." *Id.*[5]

---

[3] The intervenor-defendants "deny that notice and comment were not conducted with respect to the use of 'special procedures,'" Intervenor's Answer ¶ 18, ECF No. 17, though it is unclear whether the intervenor-defendants contest the fact that the 2011 TEGLs themselves were promulgated without notice-and-comment procedures.

[4] The Herding TEGL also states that "[a]s a condition of receiving an H-2A labor certification, an employer must comply with all applicable Federal, State, and local employment-related laws and regulations, including the mandatory State minimum wage rates for the occupation." Herding TEGL, 76 Fed. Reg. at 47,258.

[5] SWAs are "[s]tate government agenc[ies] that receive funds pursuant to the Wagner-Peyser Act (29 U.S.C. [§] 49 et seq.) to administer the State's public labor exchange activities." 20 C.F.R. § 655.103(b).

Both the 2001 and the 2011 special procedures for herders, however, require that any prevailing wage survey be conducted in accordance with ETA Handbook No. 385, which has been in place since 1981. *See id.*; Defs.' Summ. J. Mem. Ex. B at 8; *see also* Defs.' Summ. J. Mem. Ex. D, ECF No. 28-5 (ETA Handbook No. 385). ETA Handbook No. 385 instructs state agencies to survey only "domestic seasonal workers" in a given activity to calculate a prevailing wage. *See* Defs.' Summ. J. Mem. Ex. D at 5.

B.    **Factual and Procedural Background**

The plaintiffs in this action are "four workers with experience in sheepherding or in the open range production of livestock." Pls.' Mem. in Opp'n to Def.-Intervenor's Mot. to Dismiss ("Pls.' Opp'n") at 3, ECF No. 26. The plaintiffs all originally came to the United States as guest workers under the H-2A visa program, though none of them currently participates in the H-2A program. *See id.*; *see also* Decl. of Reymundo Zacarias Mendoza ("Mendoza Decl.") ¶¶ 4–5, ECF No. 26-1; Decl. of Francisco Javier Castro ("Castro Decl.") ¶¶ 3–4, ECF No. 26-2; Decl. of Alfredo Conovilca Matamoros ("Matamoros Decl.") ¶¶ 3–4, 8, ECF No. 26-3; Decl. of Sergio Velásquez Catalán ("Catalán Decl.") ¶¶ 3–4, ECF No. 26-4. All four plaintiffs aver that they reside lawfully in the United States and are permitted to work in the United States. *See* Mendoza Decl. ¶ 8; Castro Decl. ¶ 6; Matamoros Decl. ¶ 6; Catalán Decl. ¶ 7.[6] The plaintiffs also claim that they are able, willing, qualified, and available to work in the open-range production of livestock in the United States, though none of them currently works in that field because they say that the importation of foreign labor has depressed wages for open-range herders, which has

---

[6] Plaintiff Castro does not specifically aver that he is permitted to work in the United States, but he does aver that he is a lawful permanent resident, *see* Castro Decl. ¶ 6, and lawful permanent residents "have the right, without limitation, to work in the United States," *Kim v. Ziglar*, 276 F.3d 523, 528 (9th Cir. 2002), *reversed on other grounds by* 538 U.S. 510 (2003).

prevented them from reentering their preferred line of work.  *See* Mendoza Decl. ¶¶ 9–12; Castro Decl. ¶¶ 7, 9–10; Matamoros Decl. ¶¶ 7–12; Catalán Decl. ¶¶ 8–11.

The plaintiffs filed their complaint in the instant action on October 7, 2011, stating one cause of action that challenges the validity of the 2011 TEGLs under the APA.  *See* Compl. ¶¶ 20–21.  As a result of the procedural deficiencies alleged, the plaintiffs seek (1) a declaratory judgment that the defendants violated the APA by failing to subject the 2011 TEGLs to notice-and-comment procedures; and (2) an order vacating the special procedures contained in the 2011 TEGLs and "enjoining the defendants from using any special procedures for H-2A certification of sheepherder, goatherder, and open range production of livestock jobs unless and until such procedures have been adopted through notice-and-comment rulemaking."  *Id.* at 7.

On December 14, 2011, the Western Range Association and the Mountain Plains Agricultural Service (collectively the "intervenor-defendants") filed a motion to intervene as defendants in this action on the grounds that "together [they] represent almost all of the employers affected by the action that Plaintiffs are challenging, their interests are directly at stake, neither party can be counted upon to protect those interests, and the disposition of this action in their absence would likely impair or impede their interests."  Joint Mot. to Intervene at 1, ECF No. 15.  The intervenor-defendants "are associations whose membership consists of agricultural employers involved in the open range production of sheep and livestock which hire foreign herders under the H-2A program."  Mem. of P. & A. in Supp. of Joint Mot. to Intervene at 1, ECF No. 15-3.  Approximately two weeks after the motion to intervene was filed, on December 27, 2011, the parties stipulated to the requested intervention.  *See* Joint Stipulation on Intervention & Proposed Scheduling Order at 2, ECF No. 16.  On January 4, 2012, the Court granted the motion to intervene.  *See* Minute Order dated Jan. 4, 2012.  Currently pending before

the Court are the intervenor-defendants' motion to dismiss for lack of subject-matter jurisdiction, and three cross-motions for summary judgment filed by the plaintiffs, the government defendants, and the intervenor-defendants, respectively.  For the reasons discussed below, the Court concludes that the plaintiffs do not have standing, and therefore the Court grants the intervenor-defendants' motion to dismiss.

## II.    LEGAL STANDARD

When faced with a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a court has "an affirmative obligation to consider whether the constitutional and statutory authority exist" for it to hear the case.  *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted).  For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (internal quotation marks omitted).  When the purported lack of jurisdiction stems from a lack of standing, however, the court "must assume that [the plaintiff] states a valid legal claim."  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).  The proponent of jurisdiction bears the burden of proving that it exists, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008), and while "the district court may consider materials outside the pleadings," it must "still accept all of the factual allegations in the complaint as true."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations and internal quotation marks omitted).

## III.    DISCUSSION

Article III of the United States Constitution limits the federal judicial power to the resolution of "Cases" and "Controversies."  U.S. CONST. art. III § 2.  "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  In other words, "[t]he case-or controversy doctrines state fundamental limits on federal judicial power in our system of government."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "The Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."  *Id.*

As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, the plaintiff must have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (citations and internal quotation marks omitted).  Second, there must be "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged action of the defendant.  *Id.*  Finally, it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 561.  Moreover, when a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harms are insufficient.  *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Rather, when declaratory or injunctive relief is sought, a plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury."  *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

Additionally, a plaintiff may assert the violation of a procedural right as the basis for standing, but only "so long as the procedures in question are designed to protect some concrete interest of his that is the ultimate basis of his standing." *Lujan*, 504 U.S. at 573 n.8. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. "[I]n order to show that the interest asserted is more than a mere general interest in the alleged procedural violation common to all members of the public," the plaintiff "must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996).

A.       **The Plaintiffs Have Not Established an Injury-in-Fact.**

In arguing that the plaintiffs lack standing to bring the instant action, the intervenor-defendants first contend that the plaintiffs have failed to allege a violation of a substantive, legally protected interest. *See* Mem. in Supp. of Intervenors' Mot. to Dismiss ("Intervenors' Mem.") at 9–11, ECF No. 18. The intervenor-defendants characterize the plaintiffs' putative legally protected interest as "a right to attractive wages and working conditions," which they argue "is not protected by law" and thus cannot be the basis for standing. *See id.* at 9, 11. The plaintiffs, however, characterize their legally protected interests as "not having their employment opportunities, wages, and working conditions adversely affected by the employment of H-2A workers," and "a right to compete for herder jobs at non-depressed wages." Pls.' Opp'n at 8.

The intervenor-defendants further argue that, even assuming that the plaintiffs rely upon a legally protected interest, the plaintiffs have not established a concrete or particularized injury to that interest. *See* Intervenors' Mem. at 11–14. Specifically, the intervenor-defendants contend that "although the plaintiffs have past experience with the field subject to the contested

agency action, they have not identified a single employer, or even region, where they intend to seek work where wages or conditions have been adversely affected by the contested procedures." *Id.* at 13.  They also argue that "there is not one factual allegation in the complaint connecting the alleged procedural defect (the Special Procedures) to the alleged substantive injury (the plaintiffs' failure to work in the Industry)."  *Id.* at 14.  The plaintiffs respond that their injury is concrete and particularized because of "their experience working as herders and their desire to return to herding on the open range."  Pls.' Opp'n at 10.  The plaintiffs claim in their brief that, although they have "actively sought work," in open-range herding, they "have not encountered any employer willing to offer employment on terms superior to those required by the challenged TEGLs."  *Id.* at 10–11.

The plaintiffs have articulated what would, in theory, be a sufficient injury in fact, but they have failed to establish that they have been *personally* injured in the way they describe. *See, e.g.*, *Allen*, 468 U.S. at 751 (holding that standing requires a "*personal* injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief" (emphasis added)).  It is well-established that "economic actors 'suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them."  *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)); *accord Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970) (holding that competitors suffered injury-in-fact where increased competition "might entail some future loss of profits"); *see also Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (acknowledging that "accounting for additional *rivals* constitutes injury in fact"); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (observing that the allegation that "paying subminimum

wages to homeworkers will injure factory employees" was "not just plausible" but was "an application of basic economic logic").  Competitor standing, however, requires that a competitor is "likely to suffer financial injury" as a result of the challenged action.  *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006).  The D.C. Circuit has made clear that "[c]laiming that regulatory action creates a 'skewed playing field,' . . . is not enough" because that claim is merely "a 'bare assertion' of competition," which is insufficient to establish Article III injury-in-fact.  *Id.* at 13–14; *accord KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) ("A party seeking to establish standing on [the] basis [of competitor standing] must demonstrate that it is 'a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action.'" (quoting *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002))).

    In light of this authority, the plaintiffs' allegations of injury-in-fact in the instant action fall short for two reasons.  First and most importantly, the plaintiffs have not established that they are in fact competing in the relevant marketplace under the challenged regulatory scheme, *i.e.*, the labor market for open-range herders, as regulated by the 2011 TEGLs.  Although the plaintiffs' brief states that the plaintiffs have "actively sought" work as open-range herders, Pls.' Opp'n at 11, this naked assertion is contradicted by the allegations in the Complaint as well as the plaintiffs' sworn declarations.  The Complaint merely states that the plaintiffs "*would* actively seek such jobs," if such jobs paid more and had better working conditions.  *See* Compl. ¶¶ 5–8 (emphasis added).  Furthermore, the plaintiffs' sworn declarations establish that, not only did all of the plaintiffs leave the open-range herding industry well before the 2011 TEGLs were promulgated, but also none of the plaintiffs have actively sought work in the open-range herding industry since the promulgation of the 2011 TEGLs.  The plaintiff who comes closest to alleging

14

an injury-in-fact is Mr. Mendoza, who avers that he was fired from his last open-range herding job in September 2010.  Mendoza Decl. ¶¶ 5–6.  Although Mendoza says that he "h[as] sought work as a herder" since that time, he has not done so "since leaving Henefer, Utah" in May 2011.  *Id.* ¶¶ 6, 11, 13.  The 2011 TEGLs did not even become effective, however, until October 1, 2011—several months after Mr. Mendoza stopped actively seeking work in the open-range herding industry.  *See* Open Range TEGL, 76 Fed. Reg. at 47,244; Herding TEGL, 76 Fed. Reg. at 47,257.  Plaintiff Castro left his last job as a sheepherder in March 2010, and his only reference to potentially reentering the open-range herding labor market was when he "f[ou]nd out about another job as a sheepherder in Washington" but "did not pursue [it]" because he "found out that the conditions were the same as the ranch [he] left."  Castro Decl. ¶¶ 4, 8. Plaintiff Matamoros avers that he left his last open-range herding job in August 2009, and although he states vaguely that he "want[s] to work as a sheepherder again" and "h[as] considered working as a sheepherder again," he has not actually endeavored to reenter the job market for sheepherders because he "h[as] never heard anybody talk about a herding job that has acceptable pay and working conditions."  Matamoros Decl. ¶¶ 4, 7–8.  Mr. Matamoros states that he "talk[s] to friends and acquaintances regularly about job opportunities" and "h[as] not found an employer willing to pay [higher] wages or provide [better] working conditions," but he does not state that he has actively sought employment in any such positions since the 2011 TEGLs were promulgated.  *See id.* ¶¶ 8–9.  This is insufficient to establish competitor standing, which requires that a plaintiff be a "*direct* and *current* competitor," not a hypothetical or conditional competitor.  *See KERM*, 353 F.3d at 60.  Finally, plaintiff Catalán states that he has not worked as an open-range herder since leaving his last position in June 2005, and he says nothing about whether he has tried to compete for open-herding jobs since October 2011.  *See* Catalán Decl.

¶ 4. Mr. Catalán merely states that he "would take an open range herding job" if it paid at least $12.50 per hour and the housing had hot water, electricity, and a bathroom. *See id.* ¶ 9.

In short, the plaintiffs' sworn affidavits confirm that none of them has been a competitor in the open-range herding industry since May 2011. Thus, the plaintiffs have failed to establish that they have suffered "a personal injury fairly traceable to the defendant's allegedly unlawful conduct." *Allen*, 468 U.S. at 751. At most, the plaintiffs state that they *would* compete for open-range herding positions if the positions offered better wages and working conditions. *See* Mendoza Decl. ¶ 11; Castro Decl. ¶ 9; Matamoros Decl. ¶ 9; Catalán Decl. ¶ 9. Yet, these sorts of "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564; *see also Snake River Farmers' Ass'n, Inc.*, 9 F.3d 792, 796–98 (9th Cir. 1993) (holding that speculative possibility of future employment in agricultural positions was insufficient to establish standing to challenge wage rates determinations under the INA).[7]

The second reason why the plaintiffs have failed to establish an injury-in-fact, under their theory of competitor standing, is that the plaintiffs have neither alleged nor shown that they are "likely to suffer financial injury" as a result of the 2011 TEGLs. *See Mobile Relay*, 457 F.3d at 13. Although this issue is also relevant to the traceability of the plaintiffs' purported injury, the presence of a financial injury that is actual or imminent is a prerequisite to establishing an injury-in-fact under a theory of competitor standing. *See id.*; *see also KERM*, 353 F.3d at 60–61. *But*

---

[7] More generally, the plaintiffs' reasons for leaving and not reentering the open-range herding industry appears to be only partially based on the wages and housing conditions approved of by the 2011 TEGLs. The plaintiffs left their former jobs as herders at least in part because they were mistreated, *e.g.*, not provided with sufficient food, having their travel documents and wages withheld, and being threatened with deportation. *See* Mendoza Decl. ¶ 5; Castro Decl. ¶ 4; Matamoros Decl. ¶ 4; Catalán Decl. ¶ 4. The 2011 TEGLs do not address any of these issues, and the generally applicable H-2A regulations (and other labor-related statutes and regulations) prohibit such mistreatment. *See, e.g.*, 20 C.F.R. § 655.122 (requiring employers to provide meals); 20 C.F.R. § 655.135 (prohibiting employers from, *inter alia*, confiscating travel documents).

*cf. Shays*, 414 F.3d at 86–90 (analogizing business competitors with electoral competitors and concluding that political candidates establish injury-in-fact by having to campaign against adversaries who obtained illegal financing).  The plaintiffs have not alleged that their actual wages or working conditions have suffered or will likely suffer in any way as a result of the challenged guidance.  In fact, the plaintiffs have not even established that the challenged guidance has adversely affected (or is likely to adversely affect) the wages and working conditions of American workers who, unlike the plaintiffs, *are* employed or seeking employment as open-range herders.  All that the plaintiffs offer in this regard is anecdotal beliefs and speculation.  *See, e.g.*, Mendoza Decl. ¶ 12 ("I believe that the presence [of] H-2A workers has depressed wages and working conditions."); Catalán Decl. ¶ 10 ("I have met sheepherders here in Washington and they have the same bad conditions that I had when I worked as an H-2A herder.").

What is more, while the plaintiffs claim that employers categorically do not hire open-range herders for more than $750 per month because of the defendants' special procedures, *see, e.g.*, Matamoros Decl. ¶ 10, the intervenor-defendants have presented unrebutted evidence that dozens of H-2A open-range herding positions are available that pay more than $750 per month.  *See* Intervenors' Ex. 1, ECF No. 34-1.  Indeed, several of these positions appear to pay substantially more than the plaintiffs say they would need to work as herders.  For example, Mr. Mendoza states that he "would be willing to work as a herder if the employer paid $1300 to $1500 per month," Mendoza Decl. ¶ 11, yet *nineteen* H-2A open-range herding positions listed in the DOL's certified job registry pay at least $1400 per month, *see* Intervenors' Ex. 1, at 1.

As a result of the plaintiffs' failure to establish that (1) they are or will likely be competitors in the labor market for open-range herding positions regulated by the challenged

guidance; or (2) they are or will likely suffer a financial injury as a result of having to compete for open-herding positions at depressed wages and working conditions, the plaintiffs have failed to establish their standing to sue.  An Article III injury-in-fact must be, *inter alia*, "concrete and particularized rather than abstract or generalized."  *Grocery Mfgs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012) (internal quotation marks omitted); *accord Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 620 (2007) (Kennedy, J., concurring) (noting "the familiar proposition that a plaintiff lacks a concrete and particularized injury when his only complaint is the generalized grievance that the law is being violated").  Yet, the only allegations that separate the plaintiffs in the instant action from the general citizenry is their pre-2011 open-range herding experience and their vague intentions to return to open-range herding someday, if the wages or working conditions improve.  Neither allegation establishes "a personal stake in the outcome of the controversy as to warrant [the plaintiffs'] invocation of federal-court jurisdiction."  *Summers*, 555 U.S. at 493 (internal quotation mark omitted).

**B.      The Plaintiffs Are Not Arguably Within the "Zone of Interests" Protected or Regulated by the Immigration and Nationality Act.**

In addition to the plaintiffs' lack of an injury-in-fact, the plaintiffs also do not satisfy prudential standing requirements.  "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test:  The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Camp*, 397 U.S. at 153).  This "zone of interests" requirement is "a gloss on the meaning of [5 U.S.C.] § 702," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987), which limits the universe of persons permitted to sue under the APA to those "adversely affected or aggrieved by agency action," 5 U.S.C. § 702.  "The essential inquiry" of the zone-of-interests

18

test "is whether Congress 'intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'"  *Clarke*, 479 U.S. at 399 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984)).  The test "is not meant to be especially demanding," *id.*, and it "do[es] not require any 'indication or congressional purpose to benefit the would-be plaintiff,'" *Patchak*, 132 S. Ct. at 2210 (quoting *Clarke*, 479 U.S. at 399–400).  Indeed, the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."  *Id.*  Nevertheless, the zone-of-interests doctrine forecloses suit "when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Id.* (quoting *Clarke*, 479 U.S. at 399).

In order to delineate the zone of interests, a court must "look to the Act itself and to its legislative history."  *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 804 (D.C. Cir. 1985).  In this case, the INA itself speaks relatively clearly about the "interests to be protected or regulated."  *See Patchak*, 132 S. Ct. at 2210.  The statute states that certification procedures are required for H-2A visas to ensure that (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States."  *See* 8 U.S.C. § 1188(a).  The manifest import of this language is that the INA's certification procedures are intended, *inter alia*, to protect American workers from the potential adverse effects of importing cheap, foreign labor.  *See, e.g.*, *Meese*, 761 F.2d at 805 (noting that "the legislative history of [the INA] (as initially passed) clearly evinces a congressional purpose to keep American labor stalwart in the face of foreign competition in the

19

United States"); *see also Am. Fed'n of Labor & Congress of Indus. Orgs. v. Brock*, 835 F.2d 912,

918–19 (D.C. Cir. 1987) (noting that "[t]he regulatory adverse effect prohibition promulgated

pursuant to the INA was expressly retained in the IRCA," which establishes "the IRCA's

continuity with its precursor in the matter of wage protection for American workers").  This

purpose is confirmed by the legislative history of the INA, which stated that the provisions

contained in what is now § 1188(a) "will adequately provide for the protection of American

labor against an influx of aliens entering the United States for the purpose of performing skilled

or unskilled labor."  H.R. Rep. No. 82-1365, at 51 (1952).  Likewise, the legislative history of

the 1986 IRCA amendments to the statute "preserved" the principle that "the importation of

foreign workers will not be allowed if it would adversely affect the wages and working

conditions of domestic workers similarly employed."  H.R. Rep. No. 99-682, pt 1, at 80 (1986).

The parties, in fact, do not disagree about the fundamental purposes of the H-2A

certification procedures.  Rather, the parties diverge over whether the plaintiffs fall within the

INA's zone of interests.  The intervenor-defendants argue that the plaintiffs do not fall within the

INA's zone of interests both because they are not "willing," within the meaning of the statue, and

also because their wages and working conditions are not being adversely affected by the

importation of foreign labor.  *See* Intervenors' Mem. at 14–19.  The plaintiffs contend, however,

that "[t]he INA explicitly protects U.S. workers, like plaintiffs, who would be working as herders

if the TEGLs had not depressed the wages and working conditions available to them."  Pls.'

Opp'n at 12–13.  The plaintiffs reason that (1) they "are U.S. workers," (2) who "allege that the

TEGLs allow the wages and working conditions in their preferred profession to be adversely

affected by the importation of foreign workers," and thus they are within the INA's zone of

interests.  *See id.* at 10–11.

The record supports the conclusion that all of the plaintiffs are "United States workers" within the meaning of the INA, since each plaintiff is, according to his sworn affidavit, either "an alien lawfully admitted for permanent residence" or "an immigrant otherwise authorized . . . to be employed in the U.S." *See* 20 C.F.R. § 655.103.  The problem for the plaintiffs, however, is that they are not "willing and available" or "similarly employed" within the meaning of 8 U.S.C. § 1188(a).  The absence of both of these features push the plaintiffs outside the arguable zone of interests that Congress intended to protect or regulate in the INA.  As the First Circuit held in the context of 8 U.S.C. § 1188, "[a] person who is willing only if certain conditions are met is not 'willing and available.'"  *Hernandez Flecha v. Quiros*, 567 F.2d 1154, 1156 (1st Cir. 1977).  The First Circuit went on to state:  "To carry the plaintiffs' ignoring conditions to its logical extent, we ask whether the cynic who said that every man has his price would say that every man is 'willing and available'?  If so, the phrase is meaningless."  *Id.*  The Court finds this reasoning persuasive.  If the zone of interests of the INA's certification procedures were as broad as the plaintiffs claim, any person could be considered within that zone so long as she professed some intention to work in a "preferred profession" on the condition that the wages and working conditions were attractive enough.  To demonstrate the absurdity of this position, an individual who claimed an intention to work in a "preferred profession" as a day laborer picking fruit—so long as the position paid $100,000 per year, permitted hourly breaks in air-conditioned huts, and paid mileage to and from the work site—would fall within the INA's zone of interests.  This example is not provided to suggest that the plaintiffs themselves have made such lofty demands, but it merely demonstrates the inherent limits of the plaintiffs' argument.

Likewise, the zone of interests of the INA's H-2A certification procedures is inherently limited by whether the complaining party is "similarly employed" to those he says are adversely

affecting his wages and working conditions.  This is a simple matter of labor economics.  The intent of the INA's H-2A certification procedures is to ensure that an influx of foreign labor does not deflate the wages and working conditions of American workers.  Yet, the differentiation of human capital in the labor market means that only those "similarly employed" will have the economic incentive to contest the importation of a given type of worker.  *See, e.g.*, *Clarke*, 479 U.S. at 399 ("The essential inquiry [of the zone of interests test] is whether Congress 'intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'" (quoting *Block*, 467 U.S. at 347)).  By way of example, an individual who makes a living fixing automobiles cannot be relied upon to challenge the wages provided to foreigners who are hired to be street-sweepers because there is no reason to believe that the wages paid or the working conditions provided to the street-sweepers have any effect (let alone an adverse one), on the mechanic's wages or working conditions—the wages and working conditions of the two professions are apples and oranges.

This conclusion is consistent with prior decisions in this Circuit.  The D.C. Circuit has held that employers challenging a denial of an H-2A certification are within the INA's zone of interests.  *See, e.g.*, *Pesikoff v. Sec'y of Labor*, 501 F.2d 757, 760 (D.C. Cir. 1974) (holding that the interest "of American employers in obtaining qualified employees" is "arguably within the zone of interests to be protected or regulated by" the INA).  The Circuit has also extended the INA's zone of interests to union members who had allegedly lost job opportunities to imported foreign workers, *see Meese*, 761 F.2d at 805, and even to alien workers challenging the denial of labor certifications, *see De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998).  What these categories of plaintiffs have in common is that they all have some proverbial skin in the game—they all have an economic interest that is arguably protected or regulated by the INA's

certification procedures.  The plaintiffs in the instant action have no such personal stake.  Rather, the plaintiffs are merely concerned bystanders vis-à-vis the open-range herding labor market, and as bystanders their "interests are so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *See Clarke*, 479 U.S. at 399.  Although the Court sympathizes with the plaintiffs' discouragement with the alleged deterioration of the wages and working conditions in their former profession,[8] that discouragement is insufficient to bring them within the INA's zone of interests.  A contrary conclusion would permit the validity of the defendants' actions to be decided "in the rarified atmosphere of a debating society," rather than the appropriate "concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  Therefore, the Court holds that the plaintiffs, as former participants in the open-range herding labor force, do not fall within the zone of interests arguably protected or regulated by the INA, and therefore they do not have prudential standing to pursue this action.

## IV.    CONCLUSION

As the foregoing discussion makes clear, the plaintiffs have not established a cognizable injury-in-fact, which is necessary to confer standing to sue under Article III.  Furthermore, the plaintiffs fall outside the INA's "zone of interests," and therefore they also lack prudential standing to sue.  Hence, this action does not satisfy Article III's case-or-controversy requirement, the Court is without subject-matter jurisdiction to hear it, and it must be dismissed.

An appropriate Order accompanies this Memorandum Opinion.

---

[8] The intervenor-defendants dispute that the 2011 TEGLs have resulted in any adverse change, stating that "the only changes the 2011 TEGLs made to the existing regime were either positive or neutral with respect to wages and working conditions."  Reply Br. in Further Supp. of Intervenor' Mot. to Dismiss at 3, ECF No. 34.

Date: February 21, 2013

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge